## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-22317-CIV-TORRES

ISABEL DIAZ,

                Plaintiff,

v.

JAGUAR RESTAURANT GROUP, LLC,
EDUARDO DURAZO,
JAGMAR MANAGEMENT GROUP, LLC,
JAGMAR BRANDS, LLC,

                Defendants.
_____/

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court upon Defendants' Motion for Summary Final Judgment ("Motion") [D.E. 21], filed February 17, 2009, and Plaintiff's Response in Opposition ("Response") [D.E. 25], filed March 16, 2009. After careful consideration of the motion, response, reply, relevant authority, and being otherwise fully advised in the premises, Defendants' Motion for Summary Final Judgment is Denied.

### I. BACKGROUND

This action was filed by Plaintiff Isabel Diaz against her former employers, Defendants Jaguar Restaurant Group, LLC, Eduardo Durazo, Jagmar Management Group, LLC, and Jagmar Brands, LLC. Plaintiff's Complaint ("Complaint") [D.E. 1] asserts a single claim: violation of the Fair

Labor Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 207(a)(1)[1] in that Defendant "willfully and intentionally refused to pay Plaintiff the overtime wages" to which she claims entitlement. Complaint ¶12 [D.E. 1].   Plaintiff alleges that between November 7, 2004 and March 7, 2008, she worked an average of 60 hours per week for which she was paid an average of $12.00 per hour, but was never paid overtime wages.  *Id.* ¶¶9-11 [D.E. 1].  Plaintiff requests double damages for all of the overtime hours to which she claims entitlement, an award of attorneys' fees, court costs and interest.

Defendants argue in the present Motion that Plaintiff cannot recover under the FLSA because she is not entitled to individual or enterprise coverage, as defined and interpreted under the statute and relevant case law.  Motion at 1 [D.E. 21].  Defendants alternatively contend that Plaintiff cannot recover under the FLSA because she has failed to produce sufficient evidence to get to the jury as to whether she worked an average of 60 hours per week.  *Id.*  Defendants therefore seek an order granting summary final judgment in their favor.

Plaintiff opposes the Motion, arguing that enterprise coverage exists in this case to trigger the FLSA, and further that she has sufficient evidence to show that she worked an average of 60 hours per week.

---

[1]      The FLSA states, in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. 207(a)(1).

## II.   ANALYSIS

### A.   *Summary Judgment Standard*

A Court should grant summary judgment "if the pleadings, the discovery and disclosure statements on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is no "genuine issue for trial" when, taking the entire record into consideration, a rational trier of fact could not find for the non-moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574. 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). The Court, when making this determination, "must view all the evidence and all the factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).

Summary judgment is appropriate "where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial." *Navarro v. Broney Automotive Repairs, Inc.*, 533 F. Supp. 2d 1223, 1225 (S.D. Fla. 2008) (citing *Celotex*, 477 U.S. at 323). Accordingly, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "A mere 'scintilla of evidence' supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).  "If the evidence advanced by the non-moving party 'is merely colorable, or is not significantly probative, then summary judgment may be granted.' " *Lamonica v. Safe Hurricane Shutters, Inc.*, 578 F. Supp. 2d 1363, 1365 (S.D. Fla. 2008) (citing *Liberty Lobby, Inc.*, 477 U.S. at 249-50).

### B.    *Enterprise Coverage*

A Plaintiff wishing to invoke the protections offered by the FLSA must satisfy the requirements for either individual or enterprise coverage.  Individual coverage exists where the employee herself was "engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).  Enterprise coverage exists where the enterprise as a whole is "engaged in commerce or in the production of goods for commerce."  *Id.*  Plaintiff herself was clearly not engaged in commerce directly.  Plaintiff thus claims coverage only through enterprise coverage.  [D.E. 25].

The FLSA defines an enterprise "engaged in commerce or in the production of goods for commerce" as an enterprise that has two or more employees who are directly engaged in commerce *or* that has employees handling goods or materials that have been moved in commerce.  The operative statute specifically defines an "enterprise" as one that:

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).[2]

29 U.S.C. § 203(s)(1)(A).  Subsection (i) thus has two distinct prongs from which an employer can qualify as an enterprise under the statute.

The Code of Federal Regulations provides further clarification:

> An enterprise . . . will be considered to have employees engaged in commerce or in the production of goods for commerce, including the handling, selling, or otherwise working on goods that have been moved in commerce by any person if . . . it regularly and recurrently has at least two or more employees engaged in such activities.  On the other hand, it is plain that an enterprise that has employees engaged in such activities only in isolated or sporadic occasions, will not meet this condition.

29 C.F.R. § 779.238.

Therefore, a single employee who is directly engaged in commerce is not enough.  Nor is it enough to have two or more employees who only engage in commerce on isolated occasions.  The statute requires instead that two or more employees (i) recurrently engage in commerce or the production of goods for commerce, or (ii) recurrently handle materials that previously moved through interstate commerce.

In this case, Plaintiff is not alleging that two or more of Defendants' employees are engaged in commerce directly.  Plaintiff is relying instead on the second prong of subsection (s)(1)(A) – that two or more employees are handling materials that have previously moved through interstate commerce.  Defendants in response do not dispute that many of the products they purchase from local distributors are likely manufactured out-of-state.  Motion at 6 [D.E. 21].  That is

---

[2]   As Defendants do not dispute that its annual gross volume of sales exceeded $500,000 during the relevant time periods, the Court is only concerned with whether the enterprise was "engaged in commerce" as defined by the Act.

not surprising for a restaurant, which uses heavy appliances for food preparation, and relies on food products and beverages that originate in different parts of the country and, indeed, different parts of the world.  The most essential "materials" required to operate a typical restaurant like this one have undoubtedly traveled in interstate or foreign commerce.

Though Defendants do not dispute these essential facts, they instead claim that no FLSA coverage exists over them under the "ultimate consumer" (a/k/a the "come-to-rest") doctrine, *id.*, which provides that once an item reaches its intended customer, the item is no longer in interstate commerce and thus any further intrastate movement does not trigger coverage for goods "in commerce" as defined by the FLSA.  *See, e.g., Polycarpe v. E & S Landscaping Serv., Inc.*, 572 F. Supp. 2d 1318, 1321 (S.D. Fla. 2008); *McLeod v. Threlkeld*, 319 U.S. 491, 493 (1943) ("[H]andlers of goods for a wholesaler who moves them interstate in order or to meet the needs of specified customers are in commerce, while those employees who handle goods after acquisition by a merchant for general local disposition are not.").  This doctrine has been repeatedly applied in our district to constrain the scope of enterprise coverage.  *See also Bien-Aime v. Nanak's Landscaping, Inc.,* 572 F. Supp. 2d 1312, 1317 (S.D. Fla. 2008); *Lamonica v. Safe Hurricane Shutters, Inc.,* 578 F. Supp. 2d 1363, 1367-68 (S.D. Fla. 2008); *Flores v. Nuvoc, Inc.,* 2008 WL 5958357 (S.D. Fla. Nov. 20, 2008); *Vallecillo v. Wall to Wall Residence Repairs, Inc.,* 595 F. Supp. 2d 1374, 1380 (S.D. Fla. 2009).

Having examined the matter closely, we conclude that some of these district court decisions could be read too broadly as applying the ultimate consumer doctrine to both prongs of a defined enterprise.  To the extent these

decisions are doing so, they are trying to be faithful to language found in recent Eleventh Circuit decisions, one published but distinguishable, and the other un-published and also distinguishable.  Faced with the same obligation to follow our circuit's law, we are bound to more narrowly apply this limitation on the scope of enterprise coverage based on published and more applicable cases.  As Judge Seitz from our Court thoroughly and persuasively analyzed the respective issues in *Exime v. E.W. Ventures, Inc.,* 591 F. Supp. 2d 1364 (S.D. Fla. 2008), that older precedent, and the reasoning behind it, convinces us that enterprise coverage was intended to be available in a case like this one, arising under the second prong of a defined enterprise in the statute.  We join in Judge Seitz's analysis of these cases.

More importantly, however, as this is ultimately a matter of pure statutory interpretation, we are bound to follow the law as primarily embodied in the text of democratically enacted statutes, as that text is understood in context.  *See, e.g., Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there . . . . When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (quoting *Rubin v. United States,* 449 U.S. 424, 430 (1981)).  In this case, the plain meaning of the relevant provisions of this statute require us to find that enterprise coverage has been established.  Absent a holding to the contrary that we are bound to follow in this Circuit, which does not exist, we are bound by that statutory language.  Add to that highly persuasive reasoning in the Circuit that supports that statutory

interpretation, then the judicial inquiry here is complete and settled in favor of finding enterprise coverage.

### 1. *Employees Handle "Materials" That "Have Been Moved in Commerce"*

The jurisdictional reach of the FLSA, as originally enacted, was very narrow. There was no "enterprise coverage" concept, and it only applied to individuals "engaged in commerce." *Dunlop v. Ind. Am. Corp.*, 516 F.2d 498, 500 (5th Cir. 1975)[3] (demonstrating that Congress rejected broader "affecting commerce" formulations) (citing *Kirschbaum v. Walling*, 316 U.S. 517, 522-23 (1942)). And to be engaged in commerce, an employee had to be directly engaged in the actual movement of goods in commerce. *See, e.g., McLeod,* 319 U.S. at 493.

The coverage of the Act was significantly expanded by the 1961 amendments, which served to (1) introduce the concept of "enterprise coverage," and (2) "include as an 'enterprise engaged in commerce' one which had employees 'handling, selling, or otherwise working on goods *that have been moved in* or produced for commerce.'" *Id*. As Judge Godbold explained, "[t]his change extended coverage to businesses with employees engaged in handling or utilizing goods *after* they had ceased the interstate portion of their movement. This approach reached those nearer the end of the chain of distribution, e.g., retail and *service establishments whose businesses were otherwise local in character*." *Id.* at 500-01 (both emphases added).

---

[3]    Fifth circuit decisions rendered on or before September 30, 1981 are binding precedent for the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Significantly, the Court's opinion in *Dunlop* highlights the fact that "this so-called retrospective approach was very much at issue in the congressional debates because of the possible constitutional problems." *Dunlop*, 516 F.2d at 501. And while the benchmark FLSA case at the time (*Maryland v. Writz*, 392 U.S. 183, 188 (1968)) "hint[ed]" (the precise issue was not adjudicated) that it "did not think there was an extension of coverage based on the handling of goods that had previously moved in interstate commerce," Judge Godbold noted that "[t]he lower courts that have considered it have held it to be within the Commerce Clause." *Dunlop*, 516 F.2d at 501 (citations omitted).

The Fifth Circuit's analysis of the law after the 1961 Amendments is fully supported by the relevant legislative history. The Senate Report accompanying the Act demonstrates Congress's intent "to make doubly certain that coverage of retail *and service enterprises* remains well within the framework of the present law." S. Rept. No. 145, 87th Cong., 1st Sess., 1961 U.S. Code Cong. & Admin. News p. 1624 (emphasis added).

But even more significantly than any reliance on legislative history, a topic that represents judicial fighting words to some,[4] Congress's intent in the 1961 amendments is reflected in the addition of important new provisions of the law that clearly illustrate the intent to broaden the statute: the creation of enterprise itself to apply to a variety of "retail or service establishments," 29 U.S.C. § 203(r)(1), that, as the Court in *Dunlop* acknowledged, must be

---

[4]   Antonin Scalia, *A Matter of Interpretation:  Federal Courts and the Law* 29-37 (1997) (criticizing legislative history as unreliable and arguing that it is inappropriate to use such history to discern a statute's intent, rather than focusing on the text and the statute's plain meaning).

considered as setting a greatly expanded context within which to interpret the statute.

Further support for that conclusion is found in the 1966 Amendments to the FLSA that eliminated a requirement of enterprise coverage that the enterprise, in order for a Plaintiff to claim coverage under the Act, purchase for resale at least $250,000 in interstate goods.  The elimination of this volume impediment to FLSA coverage demonstrated, once again, a Congressional intent to further expand FLSA coverage.  The 1966 Amendments also added provisions applying to "tipped employees," as defined in 29 U.S.C. § 203(t), and, as set forth in 29 U.S.C. § 203(m), how to calculate wages for those tipped employees for purposes of the minimum wage and overtime provisions of the statute.  Given that these provisions were designed to apply to "retail and service establishments" satisfying the minimum sales requirements for enterprise coverage, it seems pretty clear that the Congress was including successful restaurant establishments like this one within the scope of the statute.  After all, it is well known that the greatest percentage of "tipped employees" in the workforce work in the food and lodging industries.

But even in this amended and greatly expanded form, the argument was still made that the Act did not provide workers like our Plaintiff with relief.  The 1966 Act continued to retain the definition of an enterprise as having had employees "handling, selling, or otherwise working on *goods* that have been moved in or produced for commerce."  The statutory definition of "goods" found in 29 U.S.C. § 203(i), which dated back to the original 1938 version of the statute, still exempted from that defined term "goods after their delivery into the

actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."   This statutory limitation, explicitly narrowing the scope of relevant goods under the statute, was not modified in any way by either the 1961 or 1966 amendments.  As a result, a Defendant seeking to avoid enterprise coverage could still argue that it was the "ultimate consumer" of the goods that had traveled in interstate commerce, and therefore employees working on such goods were not protected by the enterprise coverage provisions.

But that all changed in 1974.  Congress amended the FLSA once again, expanding enterprise coverage even further by adding the term "materials" into the second prong of the definition of an enterprise, section 203(s)(1)(A)(i).  Based upon this simple change to the statute, our Circuit in *Dunlop* recognized that the scope of enterprise coverage going forward significantly changed.   Judge Godbold's opinion did so at the same time, however, as the Court decided *Dunlop* under the then-applicable 1966 version of the FLSA.  The Court held that plaintiff Dunlop, whose only connection with interstate commerce prior to 1974 was the purchase and use of gas and oil used in the Defendant-Employer's garbage trucks (thereby making the Defendant-enterprise the "ultimate consumer" of the gas and oil), was *not* entitled to enterprise coverage under the older version of the FLSA.  516 F.2d at 502 ("We     . . . hold that *prior to* its amendment in 1974 the [FLSA] did not reach enterprises which provided only services to its customers and did not pass on any goods obtained from interstate commerce.") (emphasis added).

In other words, by couching its holding in these terms, the Fifth Circuit's opinion in *Dunlop* clearly acknowledged that the holding of the case was limited to the *pre-1974* version of the FLSA, and clearly understood that the outcome would have been different had the 1974 amendments to the statute applied to Dunlop's case. "Congress. . . said it thought that [expanding enterprise coverage to essentially every business in the nation doing the requisite volume of business] was the effect of its prior amendments, and amended the act to achieve that result" in 1974. *Id.* The opinion concluded that Congress accomplished this even greater expansion to the FLSA by including within the 1974 definition of "enterprise" one which has "employees handling, selling, or otherwise working on goods *or materials* that have been moved in or produced for commerce . . . ." *Id.* (quoting 29 U.S.C. § 203(s)(1)(A)(i)). The introduction of that term was significant, because the "ultimate consumer" limitation in the statute was found only in the definition of "goods" and not included within any definition of "materials." *Id.*

*Dunlop*, therefore, now stands for the proposition that the ultimate consumer or come to rest doctrine, embodied in the limitation to the definition of "goods" found in § 203(i), is no longer relevant to the enterprise coverage analysis when the second prong of an enterprise is at issue. True, one could constrain *Dunlop's* discussion of the effect of the 1974 amendments as dicta. But it was not just run-of-the-mill dicta, because the distinction between those amendments and the earlier version of the law that governed the scope of that particular case was pivotal to the outcome of the case. It is clear from *Dunlop* that the Fifth Circuit agreed that, so long as "materials" continuously utilized by

an enterprise like a retail or service establishment had traveled in interstate commerce at some point in the past, enterprise coverage under this prong of the statute existed if the minimum sales volume threshold was also satisfied.[5]

It is significant that other federal courts recognized this expanded scope of coverage at or about the time that the 1974 amendments were passed.  For starters, Judge Fulton from our own district described in 1977 what he understood to be the result of the 1974 amendments and how his interpretation of those amendments was bound by the *Dunlop* decision:

> When Congress amended the Fair Labor Standards Act to include enterprise coverage where employees handle, sell, or work on goods *[or materials]* which have been moved in or produced for commerce, coverage of the Act was extended to businesses with employees engaged in handling or utilizing goods after they had ceased the interstate portion of their movement.  *Dunlop v. Industrial America Corp.,* [ ] 516 F.2d 498 (5th Cir. 1975).  The legislation was designed to regulate enterprises dealing in articles purchased intrastate after travel in interstate commerce.  *Brennan v. Greene's Propane Gas Service,* [ ] 479 F.2d 1027 [5th Cir. 1973]; *Shultz v. Kip's Big Boy, Inc.,* [ ] 431 F.2d 530 (5th Cir. 1970). It is admitted by the defendants that their employees handled products which had moved in interstate commerce. . . .
>
> In *Dunlop v. Industrial America Corp.,* [ ] 516 F.2d 498 (5th Cir. 1975), the Fifth Circuit limited the [ultimate consumer] principle and held that the Act does not cover an enterprise which merely consumes interstate products itself while providing only services to its customers *[but under the pre-1974 of the FLSA].*

---

[5]     We note as well that, in addition to the Court's analysis in *Dunlop,* Judge Seitz's decision in *Exime* relied persuasively on the Senate Report accompanying the amendment: "The bill also adds the words 'or materials' after the word 'goods' in § 203(s)(1)(A)(i) to make clear the Congressional intent to include within this additional base of coverage the *handling of goods consumed in the employer's business, as, e.g., the soap used by a laundry.*" *Exime,* 591 F. Supp. 2d at 1370 (emphasis in original) (quoting S. Rept. No. 93-690, 93rd Cong., 2nd Sess., at 17 (1974)).  Because we do not believe that there is any ambiguity in this statutory language, however, we do not rely per se on legislative history. The context of the statute, however, clearly points in the same direction as the discussion that follows explains.

*Marshall v. Suicide Prevention of Florida,* 1977 WL 1766, at *2 (S.D. Fla. Aug. 1, 1977) (clarifications added).

One year later, the Chief Judge of the Middle District, formerly a member of our Court, explicitly held following *Dunlop* that the ultimate consumer limitation, for enterprise coverage purposes, were not as relevant after the 1974 Amendments. *See Marshall v. Whitehead,* 463 F. Supp. 1329 (M.D. Fla. 1978) (Young, J.). With apologies to the reader, we quote the discussion liberally here to develop the context and demonstrate how well understood the effect of the *Dunlop* decision was at the time:

> The Secretary contends that as a result of the 1974 amendments, the activities of certain of defendants' employees in handling petroleum products, tires and mechanical parts used in fueling, lubricating and maintaining defendants' trucks and equipment, which, although purchased locally, previously moved in interstate commerce, are sufficient to give rise to the application of enterprise coverage to defendants' operations subsequent to the effective date of the amendments. Consequently, plaintiff contends that even if the materials are "consumed" by defendants in their business, subsequent to May 1, 1974, defendants are clearly subject to the overtime and record keeping provisions of the act and liable for violations thereof. *Dunlop v. Industrial America Corp.,* 516 F.2d 498, nn. 8, 9 (5th Cir. 1975); *Brennan v. Jaffey,* 380 F. Supp. 373, 377-79 (D. Del. 1974). The defendants attempt to rely on the "ultimate consumer" exception in the definition of "goods" to remove them from coverage under the expanded definition of "enterprise engaged in commerce or production of goods for commerce" in Section 3(s), contending that all such materials used are for use solely by defendants and are not passed on to any customers. . . . *This however, fails to take into consideration the specific addition of the words "or materials" in the broadened definition of enterprise contained in the amended Section 3(s).*
> 
> * * *
> 
> Very persuasive on this point as well is the Fifth Circuit's opinion in *Dunlop v. Industrial America Corporation,* 516 F.2d 498 (5th Cir. 1975). The Court there was faced with the question of whether a business which consumes gasoline and oil in the process of providing services to its customers is the "ultimate consumer" of those goods under Section 203(i), and therefore not subject to FLSA coverage. The defendant Industrial America Corporation operated

a wholly intrastate garbage removal service, and its only tie to interstate commerce was that it had four employees who used gasoline and oil products that had moved in interstate commerce in operating and maintaining the company's trucks. The question arose in the context of a pre-1974 amendments situation, and the Court held that the defendant was not covered.

The Court did however express its view on the scope of the amended Section 3(s), stating that its effect would be to bring within coverage under the Act every enterprise in the nation doing business of $250,000.00 a year[.] . . . Impliedly therefore, the Fifth Circuit indicated that its interpretation of the effect of the amended Section 3(s) would extend coverage of the Act to employers such as the defendants herein, who conduct a wholly intrastate business, but whose employees, in the course of that business, use and handle any products, including gasoline, oil, and tires in operating and maintaining equipment and trucks, which products have moved in interstate commerce, even though the products are purchased locally. *The Court recognizes that the statement concerning the future scope of Section 3(s) of the Act . . . is dicta only; however, this Court is persuaded that the Fifth Circuit has correctly expressed the intent of Congress in enacting the 1974 amendments.*

The Court therefore finds that, as to the period subsequent to the effective date of the 1974 amendments to the F.L.S.A., to-wit: May 1, 1974, the defendants' operations constitute an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s) of the Act. The defendants are therefore subject to the overtime and record keeping provisions of the Act as to each and every employee for that time period.

*Id.* at 1337-39 (emphasis added; quotation omitted).

Quite notably, the court's decision in *Marshall* had to apply FLSA enterprise coverage before and after the 1974 amendments. As detailed above, Judge Young readily found that, as per *Dunlop,* enterprise coverage clearly applied under the second prong of an enterprise to a business using petroleum products, tires and mechanical parts for the maintenance of its trucks and equipment, even though those products (i.e. "materials") had been purchased locally after having been previously moved in interstate commerce. For the scope of coverage that applied before the 1974 amendments, again as per

*Dunlop,* Judge Young found that enterprise coverage could not extend to such a business:

> The defendants herein are primarily engaged in providing fill dirt and performing clearing and grading services preparatory to initial construction.  All the fill was obtained from local borrow pits and the defendants received nothing from interstate commerce which would be in the nature of materials "processed" by the defendants' employees and passed on in their work.  The only items so purchased by the defendants were the gas and other petroleum products, tires and mechanical parts used in operating and maintaining defendants' trucks and other machines.  [T]he Court finds that the use of such products by the defendants' employees in the course of its business makes the defendants the "ultimate consumers" of such goods within the meaning of Section 3(i) and renders them excepted from coverage under Section 3(s) on this ground.

*Id.* at 1341.

Our review of other caselaw during this period reveals that Judge Young's analysis clearly prevailed.  To begin with, very few cases in the circuit after this period discussed or questioned the effect of *Dunlop* on enterprise coverage cases.  By then other circuits had also adopted the same view.  *See, e.g., Donovan v. Scoles,* 652 F.2d 16, 18 (9th Cir. 1981) (citing *Dunlop* as well as *Brennan v. Dillon,* 483 F.2d 1334, 1337 (10th Cir. 1973); *Shultz v. Deane-Hill Country Club, Inc.*, 310 F. Supp. 272, 277 (E.D. Tenn. 1969), *aff'd,* 433 F.2d 1311 (6th Cir. 1970); *Brennan v. State of Iowa,* 494 F.2d 100, 104 (8th Cir. 1974), *cert. denied,* 421 U.S. 1015 (1975)).  Hence it seems that by then it was well understood that the 1974 amendments put to rest the use of the ultimate consumer limitation in enterprise coverage cases under the "materials" prong of the statute.

*Dunlop* has not been overruled or vacated in any way in the intervening thirty years.  The holding of the opinion is binding in this Circuit, together with the lynchpin of its analysis – the difference between the 1966 version and 1974

versions of the statute. That is so because, under "the well-established prior panel precedent rule of [the Eleventh] Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1289, 1292 (11th Cir. 2005) (quoting *Smith v. GTE Corp.,* 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)).  The effect of the 1974 amendments, construed by *Dunlop,* should now be settled:  the inclusion of "materials" in the second prong of subsection s(1)(A)(i) rendered the ultimate consumer limitation on the defined term "goods" irrelevant.

Applying this settled law to the present day case, the Defendant has stipulated that materials used by its employees during the course of the restaurant's operations have traveled in the past in interstate commerce. Defendant has also stipulated that the yearly gross volume of sales for the business exceeds $500,000.  As per the FLSA post-1974, these "materials" are sufficient to trigger enterprise coverage under the second prong of 29 U.S.C. § 203(s)(1)(A)(i) because, even if the business purchased those materials locally from Florida restaurant or food product distributors, they have "in the past" traveled in interstate commerce.  And enterprise coverage exists even if Plaintiff cannot show that he or other employees were directly engaged in the actual movement of goods in commerce.

Putting aside for the moment that *Dunlop*, in our view, effectively settles this issue in our Circuit, basic principles of statutory construction routinely applied today yield the same result.  In the first place, the statute's modern text

clearly makes a distinction between materials and "goods."  The use of the disjunctive "or" between "goods or materials," purposefully inserted in the 1974 amendments to that provision, shows that the Congress was making an addition to the statute, not simply inserting a superfluous synonym.  *See, e.g., Spector v. Norwegian Cruise Line, Inc., Ltd.,* 545 U.S. 119, 135 (2005) ("Title III does not define 'difficulty' . . . but use of the disjunctive -- "easily accomplishable and able to be carried out without much difficulty or expense" -- indicates that it extends to considerations in addition to cost.").[6]

Therefore, "materials" under this prong of the statute are purposefully not just "goods" as defined in § 203(i), which exclude "goods after their delivery into the actual physical possession of the ultimate consumer thereof . . . ."  They are indeed "materials" that are defined in customary English usage as:  "(1): the elements, constituents, or substances of which something is composed or can be made[;] something (as data) that may be worked into a more finished form[;] (2): apparatus necessary for doing or making something."  Merriam-Webster Online Dictionary (2009); *see also* American Heritage Dictionary 1079 (4th ed. 2006) ("1. The substance or substances out of which a thing is or can be made. . . . 3. Tools or apparatus for the performance of a given task[.]").[7]

---

[6]    Similarly, Congress was also clearly making an addition to the statutory definition of an enterprise when it originally added the "goods or materials" prong in 1961.  The use of the disjunctive "or" between the first and second prongs of that revised subsection means that there are two distinct ways in which an employee can establish enterprise coverage.

[7]    In the absence of a statutory definition, we can certainly look to traditional English definitions of statutory language.  *See, e.g., MCI Telecomms. Corp. v. AT&T,* 512 U.S. 218, 225-29 (1994) (using dictionary definitions of "modify" to determine statute's meaning); *Walters v. Metropolitan Ed. Enterprises, Inc.,* 519 U.S. 202, 207 (1997) ("In the absence of an indication to the

The plain meaning of the added word "materials" is thus readily apparent. The Congress was not requiring that those substances or tools used in a service establishment like a restaurant, such as food or beverages served to its customers, had to have been purchased by the ultimate consumer (i.e., the restaurant) in interstate commerce. To the contrary, the restaurant could have obtained those substances or tools wholly intrastate, but enterprise coverage would still exist if those materials had "in the past" traveled in interstate commerce and been utilized for the services rendered by the restaurant by two or more employees.

Second, to read "materials" as simply a synonym for "goods," as Defendant here tries to do, thereby imposing the same ultimate consumer limitation found in section 203(i) on materials like these, runs counter to an important and well established canon of interpretation. When "'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 452-53 (2002) (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983)). Thus by retaining the "ultimate consumer" limitation in the subsection of the statute defining "goods" but excluding that limitation in the subsection of the statute defining enterprise coverage for handling "materials," we traditionally construe that disparate treatment as being intentional and purposeful.

---

contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'") (quoting *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388 (1993) (internal quotation marks and citation omitted)).

Hence, in a case where materials are at issue under the second prong of the definition of an enterprise, the "ultimate consumer" limitation has no application. *See also Exime*, 591 F. Supp. 2d at 1371 (Court should "give effect, if possible, to every word and clause" contained in a statute, citing *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1204-05 (11th Cir. 2007)).

Finally, if we step back to ask what the Congress meant in the original 1938 statute with its "goods" limitation found in section 203(i), as opposed to what a very different Congress meant in 1974 by adding "materials" to the enterprise coverage provision in question, the answer is evident from the quite disparate contexts in which these provisions were adopted. The original definition of goods was adopted in a FLSA statute that was purposefully limited to only those individual employees who were themselves participating in interstate commerce. The context of the 1974 amendments was precisely the opposite. A far more liberal Congress was certainly seeking to expand enterprise coverage even further than it did in 1961 and 1966, for employees who were not directly engaged in interstate commerce.

Context here thus clearly matters. The context of these different provisions makes clear what interpretation we should now give to the amended definition of enterprise coverage. *See, e.g., Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 528 (1989) (Scalia, J., concurring) ("The meaning of terms on the statute books ought to be determined, not on the basis of which meaning can be shown to have been understood by a larger handful of the Members of Congress; but rather on the basis of which meaning is (1) most in accord with context and ordinary usage, and thus most likely to have been understood by the whole

Congress which voted on the words of the statute (not to mention the citizens subject to it), and (2) most compatible with the surrounding body of law into which the provision must be integrated . . . .").

Thus, understanding that context, what the Congress intended by including the term "materials" within the second prong of the enterprise coverage provision was to add within the statute's sphere many new employees that were not previously covered. Those broadened class of workers, like restaurant workers at the Defendant's business, do not directly participate in interstate commerce. But the enterprise as a whole does by using materials that at some point along the chain traveled in interstate commerce.

### 2. *Recent Eleventh Circuit and District Court Decisions*

Fast forward then to 2006 and beyond. We recognize that the cases relied upon by Defendant (including several recent Southern District cases interpreting language found in two Eleventh Circuit cases) ostensibly support a far different construction of enterprise coverage that takes us back to where we were prior to 1974. *See, e.g., Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1267 (11th Cir. 2006) (citing *Dunlop* in part for the proposition that "[w]hen goods reach the customer for whom they were intended, the interstate journey ends and employees engaged in any further *intra*state movement of the goods are not covered under the Act.") (emphasis in original) (citations omitted); *Lamonica*, 578 F. Supp. 2d at 1367 ("[A] customer who purchases an item from Home Depot is not engaged in commerce even if Home Depot previously purchased it from out-of-state wholesalers."); *Navarro*, 533 F. Supp. 2d at 1226 ("[T]he out-of-state shippers send the parts to the local dealer, where they are kept until they are

purchased in the local market.  Therefore, the interstate journey stops when the parts reached [sic] the local dealer.").

To the extent these district court were applying the second prong of enterprise coverage under section 203(s)(1)(A)(i), which is at issue here, they may be over-relying on distinguishable, but more recent, Eleventh Circuit cases, and overlooking the analysis of the question in *Dunlop* following the 1974 amendments to the FLSA.

So where did the confusion originate?   It seems to have begun with the Eleventh Circuit panel decision's summary discussion of *Dunlop* in *Thorne v. All Restoration Services,* which was a case decided entirely under the individual coverage provisions of the FLSA.  A worker, Thorne, who was employed by a small mold restoration company sued for overtime compensation under the FLSA.  Thorne claimed that the company was covered by the enterprise coverage as well as the individual coverage provisions of the statute.  At trial, however, only Thorne testified in his case in chief.  The trial court, Judge Cohn from our district, entered Rule 50 judgment as a matter of law on both the enterprise coverage and individual coverage components of the case.  *See* Case No. 04-60095, D.E. 46 (S.D. Fla. Feb 1, 2005).

On appeal to the Eleventh Circuit, Thorne did not challenge Judge Cohn's finding that enterprise coverage had not been established as a matter of law.  Apparently there was no testimony in the record at that point in the trial that even the $500,000 sales threshold had been met.  *See* Brief for Appellant, 2005 WL 4814060, at *3-7 (11th Cir. May 31, 2005).  The Court's opinion expressly

acknowledged that enterprise coverage was no longer at issue on appeal.  448 F.3d at 1265 n.1.

The Court then examined whether Judge Cohn's determination as to individual coverage should be upheld.  The individual coverage issue, as the Court pointed out, turned on whether Thorne was "directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, e.g., transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel."  *Id.* at 1266.  That is undoubtedly the test for individual coverage under 29 U.S.C. § 207(a)(1) and the regulations thereunder, 29 C.F.R. §§ 776.23(d)(2), 776.24 (2005).

The statutory definition for enterprise coverage, by contrast, does not only apply to employees with "direct participation" in the "actual movement" of things in interstate commerce.  That is a far narrower test found in the first prong of the statute, *which is precisely why* the 1961, 1966 and 1974 amendments created and expanded enterprise coverage under the statute.  *See* 29 U.S.C. § 203(s)(1)(A)(i) ("has employees engaged in commerce or in the production of goods for commerce, *or* that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person") (emphasis added).

It is telling, for instance, that many of the primary decisions cited by the Eleventh Circuit's decision in *Thorne* were *from the 1940's*.  448 F.3d at 1266-68 (citing *McLeod v. Threlkeld,* 319 U.S. 491, 496-97 (1943) (finding that plaintiff's

activities were purely local, and he was not individually engaged in commerce when he merely cooked and cleaned for railroad workers); *Kirschbaum v. Walling,* 316 U.S. 517, 518- 526 (1942)).

The outcome in *Thorne* is thus entirely expected and non-controversial. The same cannot be said, as it turns out, of the Court's citation and reliance on the Fifth Circuit's decision in *Dunlop* as follows:

> Courts distinguish between merchants who bring commerce across state lines for sale and the ultimate consumer, who merely purchases goods that previously moved in interstate commerce for intrastate use. Therefore, a customer who purchases an item from Home Depot is not engaged in commerce even if Home Depot previously purchased it from out-of-state wholesalers.
>
> In *Dunlop v. Industrial America Corporation,* 516 F.2d 498, 499 (5th Cir. 1975), the court was faced with the question of whether a business which consumes gasoline and oil in the process of providing services to its customers is the "ultimate consumer" of those goods, and therefore not subject to FLSA coverage. The defendant corporation operated a wholly intrastate garbage removal service, and its only tie to interstate commerce was that its employees used gasoline and oil products which had moved in interstate commerce in operating and maintaining the company's trucks. The court held that the defendant was not covered because it was an "ultimate consumer" of the goods. *Id.* at 499-502.

448 F.3d at 1267-68.

From this discussion, one is left with two important impressions. One is that *Dunlop* stands for that proposition today. And, two, is that this proposition applies equally to individual coverage cases like *Thorne,* as well as enterprise coverage cases like *Dunlop.* Both impressions are flatly incorrect. First, *Dunlop* does *not* stand for the proposition that, even after the 1974 amendments, enterprise coverage under the second prong of subsection s(1)(A)(i) fails when an entity is the ultimate consumer of "materials" as well as goods that have moved in interstate commerce in the past. The *Thorne* decision never explained that

the holding in *Dunlop* was out-dated by the Court's own admission after 1974. That omission was not critical, of course, to the outcome in *Thorne*. Frankly, the entire citation and reference to *Dunlop* was indeed dicta because the holding in *Thorne* was expressly not applicable to enterprise coverage.[8]

Second, *Dunlop* also does not apply to individual coverage analysis. *Dunlop* was focused on the second prong of the enterprise definition. Unlike the first prong of that definition, individual coverage analysis is entirely distinct from the "goods or materials" prong of the statute. *Dunlop* thus has no relevance to a case limited to individual coverage. Similarly, *Dunlop* has no application to an enterprise coverage case that is based on the first prong of the statute. And, for the same reason, *Thorne* has no relevance to a case governed by the broader second prong of subsection s(1)(A)(i). Yet, *Thorne's* reliance on *Dunlop* seems to suggest quite the opposite.

That is also evident from a later Eleventh Circuit case, *Scott v. K.W. Max Invs., Inc.*, 256 Fed.Appx. 244 (11th Cir. 2007). That case, at first blush, appears to have relied on *Thorne's* individual coverage analysis and the "ultimate

---

[8]     But as Circuit Judge Pierre Level recently warned us in a very persuasive article criticizing our reliance on dicta, use of misleading dicta in judicial opinions has consequences. "When we thoughtlessly copy a statement of law from a prior opinion in a manner that determines nothing in the case before us, we risk misunderstanding the context and getting it wrong, introducing confusion and error." Pierre Leval, *Judging Under Our Constitution: Dicta About Dicta,* 81 N.Y.U. L. Rev. 1249, 1267 (2006). *See also McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1315 (11th Cir. 1998) ("Somewhat like statements in a law review article written by a judge, or a judge's comments in a lecture, dicta can be used as a vehicle for offering to the bench and bar that judge's views on an issue, for whatever those views are worth. The persuasiveness of the rationale given can increase the weight accorded those views, but the fact that the views are formed and put forward in a context of a case in which they do not matter will always subtract from the weight given them.") (Carnes, J., specially concurring).

consumer" limitation to decide an enterprise coverage claim.  And it has been cited as such by some district court opinions, *infra*.  Yet that opinion did not once mention *Dunlop* or distinguish its analysis of the expansion of enterprise coverage via the "materials" prong added in 1974.  It did not need to do so, in fact, because it was deciding the enterprise coverage issue primarily on the "first prong" of the statute.  The court's holding as to enterprise coverage claim was focused on whether there was any evidence in the record of any "actual movement" of goods in commerce.  None was presented except for a single isolated purchase of lumber in interstate commerce that did not qualify as a regular and recurrent practice.  With respect to the second prong of enterprise coverage, "goods or materials" that had been moved in commerce in the past, the Court's discussion was quite limited.  "Scott offers no specific argument or any evidence that any of the goods purchased from Home Depot had been moved in or produced for interstate commerce." *Id.* at 248.  Therefore, we do not read *Scott* as holding in any way that the ultimate consumer limitation applies to "materials" under the second prong of the statute.[9]

Unlike Judge Seitz's opinion in *Exime,* however, several Southern District cases rely on the conclusion that *Scott* permits the use of individual coverage case definitions to decide enterprise coverage cases as a general matter.  This is simply too broad a proposition.  With respect to the "goods or materials" prong of the statute, as discussed earlier, the 1974 amendments significantly broadened

[9]     Moreover, even if one could read *Scott* as applying the ultimate consumer limitation on an enterprise coverage case relating to the second prong of the statute and "materials" traveling in interstate commerce, the case is not binding and is, at best, persuasive authority.  *See* 11th Cir. R. 36-2.   Persuasive authority, maybe, but no where near as persuasive as *Dunlop*, which we deem to have more binding effect.

that definition of enterprise coverage, extinguishing the "ultimate consumer" issue altogether from that prong of the statute.  This significant change to the text of the statute did not apply to individual coverage cases governed by 29 U.S.C. § 207(a)(1), nor did it apply to the first prong of the definition of an enterprise under 29 U.S.C. § 203(s)(1)(A)(i).

Like Judge Seitz, we do not choose to follow those cases that read more into the holding in *Scott* and the dicta in *Thorne*, and overlook the significance of the holding and analysis found in *Dunlop*.  *See, e.g., Lamonica*, 578 F. Supp. 2d at 1366; *Ben-Aime,* 572 F. Supp. 2d at 1317; *Polycarpe*, 572 F. Supp. 2d at 1321. We certainly do not question the outcome of these decisions to the extent they were based, as several seem to be, on the first prong of the enterprise coverage provision.  The ultimate consumer doctrine certainly continues to apply, as it does for individual coverage, to enterprise coverage cases that are so limited.  If, on the other hand, the "goods or materials" prong of the statute applies, then there is no longer any need to address the ultimate consumer or "come to rest" doctrine.  The dispositive question simply asks whether two or more employees are handling materials, that have traveled in interstate commerce at some point in the past, for an enterprise with at least $500,000 in sales.  And while it is true, as Defendants contend, that fulfillment of the statutory business volume requirement is not itself sufficient to create enterprise coverage,[10] "[m]ost, if not every, Circuit Court that has spoken on this issue [including the 11th Circuit, as

---

[10]    Reply at 2-3 [D.E. 27] (citing *Lamonica*, 578 F.Supp.2d at 1368 ("It is clear from the statute that *both* the interstate commerce requirement and the gross sales requirement must be met for enterprise coverage under the FLSA.")) (emphasis added) and  *Sandoval v. Fla. Paradise Lawn Maint.*, 303 Fed.Appx. 802, 805 (11th Cir.2008) (finding that merely satisfying the gross sales requirement is not enough to establish enterprise coverage)).

well as some lower federal courts] ha[ve] . . . construed the 1974 amendment as expanding enterprise coverage to virtually all employers, so long as that employer satisfies the $500,000 gross sales requirement." *Exime,* 372 F. Supp. 2d at 1370.[11]  "Thus the enterprise commerce test, quite simply, embraces all businesses whose employees regularly handle materials previously moved across inter-state lines." *Id.* at 1372.

### 3. *Employees Handle Materials on a "Regular and Recurrent Basis"*

Having determined that, under the current version of the FLSA, Defendants' employees handled materials that are still "in commerce," we must then decide if Plaintiff has produced sufficient evidence that they did so on a "regular and recurrent" basis.

As proof of the matter, Plaintiff offers the sworn testimony of her Affidavit, [D.E. 26-2], in which she makes numerous statements regarding her personal contact with various out-of-state suppliers and vendors, as well as her knowledge of Defendants' interstate activities.  "Based on [this] testimony," Plaintiff agues, "it is axiomatic that (2) or more of Defendants' employees in the

---

[11]    *See, e.g., Dunlop*, 591 F.Supp.2d at 1370-71; *Galdames v. N & D Investment Corp.*, No. 08-20472-CIV, 2008 WL 4372889, at *5 (S.D. Fla. Sept. 24, 2008) (given the 1974 amendment, "[i]t is notable how many courts in the past three-and-a-half decades have concluded that virtually any enterprise that meets the [$500,000] gross sales requirement is subject to [enterprise coverage]."); *Daniel v. Pizza Zone Italian Grill & Sports Bar*, No. 8:07-cv-2359-T-23TGW, 2008 WL 793660, at *1 (M.D. Fla. Mar. 24, 2008) ("[E]nterprise coverage embraces virtually every business whose annual gross volume of sales or business is $500,000 . . . "); *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 695 (4th Cir. 1990); *Donovan v. Pointon*, 717 F.2d 1320, 1322-23 (10th Cir. 1983); *Marshall v. Brunner*, 668 F.2d 748, 751-52 (3rd Cir. 1982); *Donovan v. Scoles*, 652 F.2d at 18; *Archie v. Gand Central Partnership, Inc.*, 997 F.Supp. 504, 529-530 (S.D.N.Y. 1998) ("This amendment adding the words 'or materials' leads to the result that virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA.").

restaurant were using the said products that originated from outside the State of Florida on a regular and constant business [sic]." Response at 8 [D.E. 25].

Defendants object to this affidavit testimony as a basis for the enterprise coverage claim, arguing that it "flatly contradicts [Plaintiff's] deposition testimony." In support, they offer Plaintiff's sworn deposition testimony, the pertinent portions of which follow:

> Q: "When you talked to suppliers, were they local?"
> A: "The majority of them, yes."
> Q: "Were there any that weren't?"
> A: "A couple of times there was something to do with an oven…It[] wasn't here locally…They were in Fort Lauderdale…."
> Q: "They were in Fort Lauderdale?"
> A: "I remember that the supplier was something that we were waiting for in Fort Lauderdale…"
> Q: "Is it fair to say that your regular job had to do with things that were local here?"
> A: "Yes."
> Q: "You didn't do things regularly that involved anything out of the State of Florida, did you?"
> A: "No…"

[D.E. 27-2].

Defendants contend that "[w]hen a party has given clear answers to unambiguous deposition questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue and thereby defeat summary judgment with an affidavit that merely contradicts, without explanation, the deposition testimony." Reply at 5 [D.E. 27] (quoting *Van T. Junkins & Assocs. Inc. v. U.S. Inds., Inc.*, 636 F.2d 656 (11th Cir. 1984)). Defendants maintain that, as Plaintiff's inconsistent affidavit testimony must be stricken, the record no longer demonstrates that Defendants' employees "regularly and recurrently" handle materials originating outside Florida.

We agree with Defendants that substantial portions of Plaintiff's affidavit testimony are inherently inconsistent with her sworn deposition testimony. The whole of the testimony on which she relies will be set forth below, and the portions that should be stricken will be ~~stricken~~:

> ~~During my employment I regularly dealt with individuals located outside the state of Florida and also sent payments for bills outside the state of Florida. Some of my duties included sending checks and correspondence to vendors in Mexico and Los Angeles. On at least (3) occasions I sent a check directly to Chicago, IL for Defendants' supplier G.F.S. for food products.~~ On various other occasions I know G.F.S. supplied Defendants with products from out of state during my employment. ~~On at least a monthly basis I would send checks and correspondence out of the state of Florida to MVP, a company that provided Defendants' advertisement. On at least a monthly basis I would send checks and correspondence to General Restaurant Suppliers.~~ I have first hand knowledge that General Restaurant Suppliers provided Defendants with dishes and utensils that originated outside the State of Florida. ~~I made out of state payments ever several months on behalf of Defendants to F.O.H. At least every (1) or (2) months I would send checks and correspondences to King's Menus, a company that provided Defendants with uniforms, hats, and menus.~~ I estimate that Cheney Brothers provided approximately 60% of Defendants' supplies during my employment. I know Cheney regularly and constantly obtained products for Defendants that originated outside of Florida because I saw the invoices. Cheney particularly would obtain special order products (such as napkins (no less than 6,000 per order) and ramekins) from outside the state of Florida, and those special orders were regularly transported by UPS. I estimate that Sysco provided approximately 30% of Defendants' supplies during my employment. I know Sysco regularly and constantly obtained products for Defendants that originated outside of Florida because I saw the invoices.

Despite the large portion of Plaintiff's affidavit testimony that must be stricken, however, it contains portions that are not necessarily inconsistent with her deposition testimony. Those portions that testify simply to her knowledge of the enterprise having interstate dealings are not inconsistent

with her statement that she did not do anything regularly outside the state of Florida.

In addition, Plaintiff offers an affidavit of Sysco's South Florida Marketing Associate, Jessica Van Velazquez, who testified that "[i]n the last three years, Sysco has sold Jaguar numerous food products that originate from outside the State of Florida." [D.E. 26-3]. This, coupled with Defendants' admission that "foodstuffs and beverages [used at Jaguar] bought by Sysco and Chaney may have originated outside of Florida," Motion at 6 [D.E. 21], offers sufficient independent evidentiary support that Defendants' employees "regularly and recurrently" handle materials that have moved in interstate commerce.

Accordingly, summary judgment cannot be entered. At best, there are issues of fact in this record from which Plaintiff could show that Defendants' employees regularly handle materials that have traveled in commerce in the past. Defendant has thus not shown that, as a matter of law, judgment should be entered against Plaintiff on the enterprise coverage element of her claim.

## C. *Sufficient Evidence of Hours Worked*

Defendants' remaining argument as to why they are entitled to summary judgment is that Plaintiff has failed to produce sufficient evidence indicating the number of overtime hours she allegedly worked. As we know summary judgment is appropriate "where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial." *Navarro*, 533 F. Supp. 2d at 1225 (citing *Celotex*, 477 U.S. at 323). The parties dispute who has the burden of proving the hours Plaintiff worked, which is an essential element

of a claim for FLSA overtime wages.  According to the lead case regarding this issue:

> An employee who brings suit under [the FLSA] has the burden of proving that he performed work for which he was not properly compensated . . . it is the employer who has the duty under . . . the Act to keep proper records of wages, hours and other conditions and practices of employment . . . [b]ut where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-88 (1946).

Applying this well understood standard here, Plaintiff has the burden of proving the hours for which she was not properly compensated.  Of course, this is usually an easy burden to meet because it is Defendant's *duty* to keep proper records; but Defendants' failure to do so does not automatically entitle Plaintiff to the relief she seeks.  Because Defendant's records are inadequate to determine the number of overtime hours she worked, Plaintiff must fulfill her burden by (1) proving that she has, in fact, performed work for which she was not properly compensated, and (2) producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

Defendants claim that Plaintiff has failed to fulfill her burden because the evidence she produced was not sufficient to show the number of hours she worked as a matter of just and reasonable inference.  Plaintiff cites to *Reeves v. Int'l Tel. & Tel. Corp.*, 616 F.2d 1342 (5th Cir. 1980), to emphasize the "dramatic affect of an employer's failure to maintain adequate records as required [by the]

FLSA . . ."  Response at 10 [D.E. 25].  But this case is distinguishable in an important respect.  The employees in *Reeves* were ordered to report incomplete and deflated figures on overtime hours, despite frequent objection.  *Reeves*, 616 F.2d at 1346.  Here by contrast it is undisputed that, for the benefit of both parties (immigration for one; tax for the other), Plaintiff was asked to and agreed to keep a record of her own hours.  As the parties had arranged and agreed to an hour-keeping scheme apart from the ordinary that inured to the benefit of both, it seems inequitable to allow Plaintiff to benefit, at the expense of the party with whom she made the arrangement, from the absence of employer records.

On the other hand, *Reeves* and other cases clearly do support that proposition that the employer should not benefit in a FLSA case from its own purposeful evasions of federal law.  *See, e.g., Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1317 (11th Cir. 2007) (excusing Plaintiff's burden to prove overtime wages because inadequacy in employer records caused by Defendant's altering of time sheets).

The question remains, however, whether Plaintiff like the employee in *Reeves* presented sufficient evidence to make a "reasonable and just" inference of the number of hours he worked.  Plaintiff's complaint alleges that she worked an average of 60 hours per week for which she received $12.00 per hour, but never the overtime rate in excess of 40 per week, in violation of the Act.  Of course, in the summary judgment context, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Defendants argue that "Plaintiff

has not produced any evidence . . . No deposed witness has corroborated any such hours.  There is no evidence of how these numbers were determined.  Plaintiff's deposition testimony and Answers to Interrogatories admit that she has no records." Motion at 8 [D.E. 21].

As Defendants point out, the only other piece of evidence in the record that supports Plaintiff's estimation of the amount of overtime compensation she is due is the "game" referred to in her deposition in which her daughter would, twice a year, inform her of the number of hours she was away from home. Motion at 8 [D.E. 21] (citing Diaz Depo. at 102-05).  This seems to be precisely the "mere scintilla" type of evidence that will not suffice to survive summary judgment.  The records of this game, if any, are not on the record, despite having been requested by Defendant.[12]  Motion at n.3 [D.E. 21].  There has been no showing as to how the estimate of 60 hours per week was derived from this purported game.  Absent recorded evidence of this game, the Plaintiff's reference to it serves merely as an "unsupported, self-serving statement [that is] insufficient to avoid summary judgment." *Perlman v. U.S.*, 2002 WL 575788, at *6 (S.D. Fla. Mar. 5, 2002) (citations omitted).

As tempting as it may be to grant summary judgment on this basis, the Court's review of the Plaintiff's deposition testimony shows that Plaintiff's version of her usual schedule is close to the testimony provided by the plaintiff in

---

[12]    We note that unless such a record can be proven to have been periodically kept up to date would it likely survive a hearsay challenge at trial.  *See Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529, 535 (N.D. Ill. 2006) (where Plaintiff did not originally enter any evidence showing that she worked overtime hours and later supplemented the record with handwritten documents containing the hours she allegedly worked, the Court found that Plaintiff's "handwritten documents are inadmissible hearsay and not subject to any exception to the hearsay rule.") (citations omitted).

*Santelices v. Cable Wiring,* 147 F. Supp. 2d 1313, 1329 (S.D. Fla. 2001).  Based upon that plaintiff's testimony, which also appears to have been unsubstantiated through others' testimony or documentary evidence, Judge Jordan held that the testimony presented a sufficient basis to deny summary judgment on the issue, leaving it to the trier of fact to decide how credible the plaintiff was.

We will follow Judge Jordan's analysis of the issue and also deny summary judgment here.  Frankly, we doubt whether a reasonable jury could believe some of Plaintiff's version of events.  And we can certainly leave open the possibility that, on Rule 50 review, the development of the record at trial will not allow the Court to let the issue go to the jury.  For summary judgment purposes, however, we must draw all inferences in the Plaintiff's favor.  We will thus deny the motion on this limited record.

### III.  CONCLUSION

Based on the foregoing, Defendants' Motion For Final Summary Judgment [D.E. 21] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 22nd day of June, 2009.

_____
EDWIN G. TORRES
United States Magistrate Judge